UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 24-cr-113 (RC) |
| | : | |
| ELMER BONILLA, | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

Elmer Bonilla pled guilty to Using, Carrying, Possessing, and Brandishing a Firearm in Furtherance of a Crime of Violence and Aiding and Abetting, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2 in relation to several armed carjackings, vehicle thefts, and thefts from vehicles. Bonilla participated in a violent armed carjacking where he and his co-conspirators forced a complainant out of their car at gunpoint. For the reasons set forth below, the Government recommends a sentence of 84 months' incarceration, followed by five years of supervised release.

**BACKGROUND**

From December 2023 through August 2024, Elmer Bonilla and others conspired to commit a series of vehicle thefts, thefts from vehicles, and armed carjackings. Every step of the way, Mr. Bonilla was an active participant, acting for his own personal gain and putting members of the community at risk.

On or about January 24, 2024, Mr. Bonilla and his co-conspirators were driving a dark SUV in the 6000 block of Luzon Avenue Northwest, Washington, D.C. The co-conspirators stopped their car in front of a Dodge Challenger occupied by Complaining Witness 1 ("CW-1"). At least one conspirator remained in the dark SUV while two other co-conspirators got out of the car, wearing dark jackets and khaki pants, and black ski masks, and each carrying a firearm. The armed co-conspirators approached the Dodge Challenger. Specifically, one approached the

driver's side and the other approached the passenger side. Both co-conspirators demanded that CW-1 "get the fuck out of the car." The co-conspirator on the driver's side then punched CW-1 in the face. The co-conspirator on the passenger side pointed a firearm with a green laser sight at CW-1. CW-1 got out of the car and the two co-conspirators got into the Dodge Challenger and drove away, followed by the dark SUV. At the time it was carjacked, the Dodge Challenger contained the CW-1's black wallet with driver's license, debit and credit cards, a drill set, and an Apple iPhone.

The next day, on January 25, 2024, Mr. Bonilla and his co-conspirators were driving in a white Kia Sportage and pulled into the parking lot of the CVS located at 5621 Sargent Road, Hyattsville, Maryland. Complaining Witness 2 (hereinafter "CW-2") was in their car, a black BMW, and put the car into reverse to exit the parking lot. The Kia Sportage pulled behind CW-2's car, blocking it in. At least one co-conspirator remained in the Kia Sportage, while two other co-conspirators, both wearing dark clothing, ski masks, and armed with handguns, got out of the Kia Sportage and approached the driver's side of CW-2's car. They opened the driver's side door and one co-conspirators pointed a handgun at CW-2's torso. The co-conspirators demanded that CW-2 get out of the car. In fear for their life, CW-2 complied. The co-conspirators got into CW-2's car and drove it away, and the Kia Sportage followed.

On January 26, 2024, after the arrest of Mr. Bonilla's, co-defendant, Gregory Giron, Mr. Bonilla and two other co-conspirators drove to Gregory Giron's house in a tan SUV. One co-conspirator exited the SUV and used a key to enter the residence. A few minutes later, law enforcement observed that same individual exit the rear of the residence carrying a white trash bag. The co-conspirator got back into the SUV, which began driving away.

Law enforcement stopped the SUV and discovered four people in the car. The front seat passenger, identified as Dylan Giron, was the same co-conspirator who had entered and exited the house, carrying a white trash bag. The driver of the vehicle was identified as Dylan Giron's girlfriend, and the two co-conspirators in the backseat were identified as Mr. Bonilla and Christian Rodriguez. When Dylan Giron was inside the residence, Mr. Bonilla and Mr. Rodriguez were directing Dylan Giron to remove evidence via text message.

Months later, on August 6, 2024, Mr. Bonilla and other co-conspirators broke into and stole a 2021 Infinity Q50 near the intersection of Oak Lead Drive and Lockwood Drive in Silver Spring, Maryland. At the time it was stolen, the car contained the owner's identity and bank cards, which were found in a later search of Mr. Rodriguez's residence. The very next day, on August 7, 2024, Mr. Bonilla broke into another vehicle, located in the 2400 block of Ross Road, Silver Spring, Maryland, and took a wallet, which was also later found in Mr. Rodriguez's residence. Also on August 7, 2024, Mr. Bonilla and co-conspirators broke into and stole a Corvette in Alexandria, Virginia using an Autel device. The device was later recovered in Mr. Bonilla's car.

On August 9, 2024, pursuant to a search warrant, law enforcement searched Mr. Bonilla's residence and recovered the following:

- Glock magazine, which was hidden in a crawl space in the bathroom;
- 1911-style bb gun, which was inside of a locked room in the house;
- $3,920 in U.S. currency;
- Baggie of white, rock-like substance; and
- Programmable key fob

Images of some of the key items recovered from the search of the residence are pictured below:

3



*Firearm Recovered from Bonilla's House*



*White Rocklike Substance Recovered from Bonilla's House*

4



*Programmable Key Fob Recovered from Bonilla's House*

On August 26, 2024, law enforcement conducted a search of the car used by Mr. Bonilla. During that search, law enforcement recovered:

• Black Glock 23 Semi-Automatic Pistol (Serial #BZVH752) loaded with one round in the chamber and 16-rounds in a 16-round magazine

• Box of 9-millmeter ammunition containing loose ammunition

• White powdery substance packaged in individual, clear baggies

• Multiple baggies of a green leafy substance

• One loose round of 40 caliber ammunition

• Two loose rounds of 9-millimeter ammunition

• Boxes of small, clear plastic baggies

• Digital scale

• Autel Professional Key Tool

• Black ski mask

5

- Gloves

- Credit Card belonging to Dylan Giron

Images of some of the key items recovered from the search of the vehicle are pictured below:



*Loose Round of Ammunition in the Car Door*



*Autel Device Seized from the Vehicle*

## ARGUMENT

    The Government requests that the Court sentence Elmer Bonilla to 84 months of incarceration followed by five years of supervised release. Mr. Bonilla was a member of a brazen conspiracy to perpetrate armed carjackings—a pattern of violent conduct that continued for months even after some of his co-conspirators were arrested in January 2024 and released. His guilty plea confirms his active participation in an armed conspiracy, particularly where he maintained his own cache of firearms and ammunition, as well as a programmable fob and an Autel device between

7

his residence and his vehicle. Both the Guidelines and sentencing factors pursuant to 18 U.S.C. § 3553(a) warrant the requested period of incarceration.

## I. THE APPLICABLE SENTENCING GUIDELINES

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). Although the Sentencing Guidelines are advisory, under *United States v. Booker*, a sentencing court "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018). The Supreme Court has noted that while the Guidelines provide "the starting point and the initial benchmark" for sentencing, the district court should consider all the § 3553(a) factors. *Gall v. United States*, 552 U.S. 38, 49–50 (2007). The Guidelines' recommended sentencing range will ordinarily "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007).

Here, Mr. Bonilla pled guilty to one count of Using, Carrying, Possessing, and Brandishing a Firearm in Furtherance of a Crime of Violence and Aiding and Abetting, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2. (ECF 63). The parties also agreed that the applicable range was 84 months or seven (7) years incarceration, which is the mandatory minimum sentence. (*Id*.) The Defendant has no adult criminal history.

## II. SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In addition to the applicable guideline range, the Court should consider the factors listed in 18 U.S.C. § 3553(a):

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed –
   (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
   (B) to afford adequate deterrence to criminal conduct;
   (C) to protect the public from further crimes of the defendant; and
   (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for –
   (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
      (i) issued by the Sentencing Commission . . .; and
      (ii) that, . . . are in effect on the date the defendant is sentenced; . . .

(5) any pertinent policy statement –
   (A) issued by the Sentencing Commission . . . and
   (B) that, . . . is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

### A. The Nature and Circumstances of the Offense

The offense to which Elmer Bonilla pled guilty reflects a brazen and relentless carjacking conspiracy. On January 24, 2024, members of the conspiracy violently assaulted the driver of a Dodge Challenger and held the driver at gunpoint with a laser sight. A few days later, on January 26, 2024, following the violent armed carjacking, the Defendant texted one of his co-conspirators with instructions to remove evidence of the offense. At Mr. Bonilla's direction, the Defendant's co-conspirator removed a trash bag of incriminating evidence from his house that contained among other things, firearms and ammunition.

This was not an isolated lapse in judgment for the Defendant. He continued his criminal

conduct into August 2024. On August 6th, he broke into and stole an Infinity Q50 that contained the victim's identity and bank cards—items which the Defendant kept and were later found in his house. The very next day, the defendant broke into two more cars, first taking a wallet and later actually stealing a Corvette. The Autel device that facilitated the break-in was later found in the Defendant's car.

In addition to indicia of drug sale, the Defendant had his own cache of firearms and ammunition in his home and vehicle as well as instruments to steal vehicles. The confluence of having a programmable key fob, an Autel device, a ski mask, and gloves at the ready in his home and vehicle is probative of his central role in this conspiracy. In short, the evidence showed that the Defendant's residence and vehicle were staging areas for his offenses. His participation was deliberate and planned in advance, as evidenced by what was recovered in the Defendant's home. Because each step that the Defendant took in this carjacking conspiracy was deliberate and dangerous, and because he sent messages in an attempt to conceal evidence, a meaningful sentence of incarceration is warranted.

### B. Elmer Bonilla's History and Characteristics

Elmer Bonilla is 23 years old and is a longtime resident of the area. Final Presentence Investigation Report ("PSIR") ¶ 96. According to the PSIR, Mr. Bonilla had the benefit of a two-parent household where his parents always ensured that he and his sibling always had enough to eat. *Id.* ¶ 98. He had access to recreational sports throughout his childhood, to include soccer, boxing, swimming, and mixed martial arts. *Id.* Despite reporting that he had been the victim of gun violence himself, *Id.* ¶ 99, Mr. Bonilla chose to arm himself and repeatedly victimize other people in Washington, D.C. By his own report, he had employment with a construction company

from 2019 to the time of his arrest. *Id.* ¶ 113. Though he reported some struggles with substance abuse, it is notable that his girlfriend reported that she was unaware of a history of substance abuse by Mr. Bonilla. *Id.* ¶¶ 109-12. By all accounts, he grew up with a supportive family and had people in his corner throughout his life.

Despite that support, the Defendant chose to launch himself into a violent carjacking conspiracy, harming his community time and time again. Instead of simply continuing for work at his job in the construction field that he reported having since 2019, he involved himself in senseless violence—almost for sport. The Defendant stressed in his pre-sentence interview the harm that being robbed and witnessing gun violence caused him, but he victimized perfect strangers anyway.

Nothing in his supportive family structure or recreational opportunities growing up can explain away this offense. If anything, this background is an aggravator—Mr. Bonilla deliberately chose to enter a carjacking conspiracy and help perpetuate it for months. He was not a minor actor in the story but rather an architect. The facts reflect a concerning pattern: repeated willingness to associate with criminal activity, possess firearm and ammunition unlawfully, and interfere with law enforcement efforts. Though this is the Defendant's first adult conviction, his initiative and integration into this conspiracy warrants a meaningful term of incarceration.

### C. The Need for the Sentence Imposed

The requested sentence of 84 months incarceration, which represents the mandatory minimum terms for this offense, is sufficient but no greater than necessary to meet the goals of sentencing. The sentence provides specific deterrence, as it will directly bear on Mr. Bonilla and his culpability in this offense as well as general deterrence as such a sentence of incarceration will

reflect the seriousness of the offense to any others who would think to behave in such a manner. To award a lesser sentence would send the opposite signal: that individuals like Mr. Bonilla can get a slap on the wrist despite their willingness to be involved with and cover up dangerous crimes that put the community's safety at risk.

Perhaps most importantly, it will keep our community safe from any further actions by Mr. Bonilla for approximately seven years and hopefully give him pause before engaging in such criminal conduct after his release. As stated earlier, Mr. Bonilla is young—23 years old. This case represents a pivotal moment for him—he can continue down his current path of escalating criminal conduct. Or, he can embrace this sentence as a wakeup call and an opportunity to take advantage of the tools available during his incarceration and through U.S. Probation to put him on a better path once he is released. To be sure, the requested sentence is weighty for an individual who has never been incarcerated before. But it is also just because it represents appropriate punishment for someone who carjacked others, conspired to hide evidence, and maintained contraband in his home and vehicle. This will be the longest sentence of incarceration that Elmer Bonilla has received, and the government hopes that it is enough to deter him from future crimes.

### D. The Desire to Avoid Unwanted Sentence Disparities

Finally, one of the goals of the Guidelines is to avoid sentence disparities among similarly situated defendants. According to data collected by the United States Sentencing Commission, of the firearms cases reported to the Commission in 2024 where the defendant was sentenced pursuant to U.S.S.G. § 2K2.4, the median incarceration length was 60 months' imprisonment and the average incarceration length was 83 months' imprisonment. *See* United States Sentencing Commission, Interactive Data Analyzer, "Sentencing Outcomes – Sentence Length,"

https://ida.ussc.gov/analytics/saw.dll?Dashboard (last visited on December 16, 2025). The average length of supervised release was 46 months, while the median was 36 months. *Id.*

As evidenced by the Sentencing Commission's data, the government's requested sentence of 84 months' imprisonment is measured, reasonable, driven by data, and squarely in line with sentences given to similarly situated defendants. It also is warranted by the seriousness of the offense, protects the public, and promotes respect for the law.

## CONCLUSION

For all the foregoing reasons, the Government respectfully requests that the Court impose a sentence of 84 months of incarceration followed by five years of supervised release.

Respectfully Submitted,

Jeanine Ferris Pirro
United States Attorney

By:  */s/ Caelainn Carney*
CAELAINN CARNEY
Assistant United States Attorney
N.Y. Bar No. 5751672
United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20530
Telephone: 202-714-6433
Email: caelainn.carney@usdoj.gov